

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**ALBERTHA DIONNE BADON**  CIVIL ACTION

**VERSUS**  NO. 3:20-460-BAJ-RLB

**SONNY PERDUE, SECRETARY,
U.S. DEPARTMENT OF AGRICULTURE**

---

### AMENDED COMPLAINT

---

**MAY IT PLEASE THE COURT**, Plaintiff, **ALBERTHA DIONNE BADON**, files this, her Amended Complaint in the above titled case.

Plaintiff adopts in full, all statements, assertions, allegations, claims and requests for relief, including jurisdiction and venue, as contained in her original Complaint herein, as fully and completely as though the same were again set forth in this Amended Complaint.

### INTRODUCTION

1. This is an action for relief from multiple violations by listed Defendants of Plaintiff's rights under both the Constitution of the United States of America, the Constitution of the State of Louisiana, as well as applicable Federal and State Law.

2. Defendants jointly and severally subjected Plaintiff to loss of income and loss of employment based on false allegation.

3. Defendants jointly and severally subjected Plaintiff to unlawful employment practices by illegal designation as an intermittent employee.

4. Defendants jointly and severally subjected unknown numbers of persons similarly situated to Plaintiff to unlawful employment practices by illegal designation as an intermittent employees.

5. Defendants jointly and severally failed to adequately train Plaintiff and unknown numbers of persons similarly situated to as the detection and preventing fraudulent grain and commodity from being used to victimize grain and commodity buyers, although that was an integral part of Defendant's legal duties and mission.

6. Defendants jointly and severally failed to adequately train Plaintiff and then punished Plaintiff for acts and omissions they themselves failed to adequately train her for.

7. Defendants jointly and severally subjected Plaintiff to a consequent hostile work environment, suspension, at the hands of Defendants culminating in Plaintiff being fired from her position

8. Defendants jointly and severally subjected Plaintiff to at best a negligently conducted investigatory process and at worst a malicious conducted investigatory process.

9. Defendants jointly and severally subjected Plaintiff to egregiously humiliating allegations and treatment throughout this matter resulting in severe mental and physical harm.

10. Defendants jointly and severally subjected Plaintiff to negative employment reviews and or reports, subsequent to her termination, severely effecting her ability to obtain new employment.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff-Intervenor seeks damages for violation of her civil rights. This Court also has jurisdiction pursuant to rights protected by the Constitution of the United States of America.

2. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff-Intervenor's state law claims share all common operative facts with her federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

3. Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## NATURE OF THIS ACTION

1. This is an action brought pursuant to both the Constitution of the United States of America, the Constitution of the State of Louisiana, as well as applicable Federal and State Law.

2. Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, unpaid wages and penalties, and her reasonable attorneys' fees and litigation expenses as remedies for Defendants' violations of her Federal and Louisiana statutory as well as common law and civil law rights.

## PARTIES

1. Plaintiff and Defendants are re-identified as contained in her original Complaint herein, as fully and completely as though the same were again set forth in this Amended Complaint.

2. Additionally, Plaintiff amends her complaint to add the United States of America as defendant.

## STATEMENT OF FACTS

1. At all times material to this action, Plaintiff was employed the Federal Government as an FGIS inspector at facilities located in Louisiana, primarily in East and West Baton Rouge Parish.

2. Plaintiff is/was an anatomically normal adult female all times material to this action.

3. As an FGIS Inspector, Plaintiff was responsible for testing and inspecting various grain.

4. Plaintiff was trained as an FGIS Inspector.

5. Plaintiff's training, for which the Defendants were solely responsible, did not include learning how to calculate grain spillage.

6. Plaintiff's training, for which the Defendants were solely responsible, did not include the economic impact of grain spillage.

7. Plaintiff's training, for which the Defendants were solely responsible, did not include the fact that if a customer is charged for a grain/commodity shipment for which grain spillage is incorrectly calculated, then than customer or customer is overpaying for grain/commodity they did not actually receive.

8. Plaintiff's training, for which the Defendants were solely responsible, did not include the fact that if a customer is routinely and systematically charged for a grain/commodity shipment for which grain spillage is incorrectly calculated, then than customer or customer is being defrauded.

9. Despite lack of training by the Defendants, during the course of and as a result of the protracted and drawn out of this matter and the preceding related matters, through her own study and initiative, the plaintiff eventually came to understand the implications of grain spillage being routinely and systematically miscalculated by FGIS inspectors, at least locally and possibly nationwide.

10. Even without full knowledge and training of the importance of estimating grain spillage, Plaintiff always sought to insure her spillage numbers were accurate.

11. Plaintiff at times clashed with customers who wanted her to just use inaccurate spillage figures, instead insisting on doing her job diligently and accurately, often to the displeasure of the customers.

12. At some point, Plaintiff became aware that some inspectors were either inaccurately calculating spillage, at time at the request of customers, or were not fully calculating spillage, but not until much later during proceedings prior to this matter coming before this court and related research did Plaintiff realize the true significance of the foregoing.

13. Plaintiff had developed a well-deserved reputation for tenaciously engaging in whistleblowing activities.

14. Plaintiff had developed a reputation for engaging in investigatory activities above and beyond the call of duty.

15. It eventually became increasingly clear both FGIS and many customers wanted Plaintiff "gone", but Plaintiff could not at first understanding the depth and level of the animus against her.

16. Defendants had in fact investigated and sought to sanction Plaintiff for what it considered to be wrongful or "invasive "investigatory activities by Plaintiff.

17. Plaintiff's continued presence at FGIS represented a clear and present danger to any, whether Government employee or private actor, who were either negligently or deliberately improperly accounting for grain spillage.

18. Plaintiff's continued presence at FGIS represented a clear and present risk that Plaintiff would figure out the fact that if a customer is routinely and systematically charged for a grain/commodity shipment for which grain spillage is incorrectly calculated, then than customer or customer is being defrauded.

19. For example, the current price of soybeans as of March 10, 2021 is $14.0975 per bushel.

> A loading spillage from a ship hold being loaded that looks small, when actually properly calculated might equal 120 bushels.

20. 120 x $14.0975 equals $1691.70

21. If spillage is only miscalculated, whether deliberately or negligently by 50% the miscalculation would equal $845.85.

22. All cargo ships have multiple holds.

23. Assuming all the above to be true, and assuming a typical cargo ship such as FGIS are responsible for has on average four holds, that would equal $3383.40.

24. Given that, for example. The United States exported 1.778 BILLION bushels of corn along, not taking into account exports of other commodities, it is easy to understand exposure of a pervasive culture of at best negligent training spillage accounting and at worst fraudulent spillage accounting, could add up to billions of dollars in fraudulent charges to commodity buyers.

25. Any persons, whether Government employees or private actors such as grain sellers and loaders, would recognize that, since Plaintiff had developed a well-deserved reputation for tenaciously engaging in whistleblowing activities, about relatively minor work time related matters, those persons would naturally reasonably infer that should Plaintiff ever fully realize magnitude of the financial and legal implications of routinely and systematically incorrectly calculating grain spillage, she would surely pursue the matter, which might lead to sever repercussion even up to criminal charges for those involved and/or complicit.

26. Based on the foregoing, there was adequate motive to want the Plaintiff eliminated, at least from her work as an inspector and at most from her employment entirely.

27. Plaintiff was eventually accused of urinating in a grain sample bin in her work area.

28. As a result of this accusation, Plaintiff was removed from the work schedule and eventually terminated.

29. The original source of the allegation was one, Jared Mayer, a non-governmental employee of the facility Plaintiff routinely worked at.

30. Jared Mayer's written statement of the incident clearly states that Plaintiff said to him, referring to the device that Plaintiff allegedly urinated in, "people have been putting all kinds of stuff in there. Like pee!"

31. Even assuming that Mayer's statement is 100 percent true and accurate, which the Plaintiff does not concede to by referring to it, Plaintiff's reference to "people" in no way includes herself.

32. Nothing in Mayer's statement indicates in any way that Plaintiff's reference to "people" putting foreign objects or material in the sampler includes actions by the Plaintiff.

33. Given the nature and realities of the female urinary system, along with the construction and design of the device, for Plaintiff to have actually urinated in it, she would have had to have remover her work pants and undergarments and then either climbed into the device, or at best precariously or at worst impossible perched on or about it. In short, as first described, that could not and did not happen.

34. Despite the foregoing, from the very beginning, the Defendants treated the Plaintiff as if she had admitted to personally urinating in the grain bin device. Despite zero evidence to support that assumption, including the actual statement of the only possible witness other than the Plaintiff herself.

35. Despite having the authority and responsibility to do so, it truly and reasonably believed contamination of grain/commodities and or equipment involved in the sampling or testing of grain and or commodities

36. Defendants never tested the grain bin device to detect the presence or lack of presence of urine or any other foreign materials, including but not limited to DNA evidence.

37. Defendants never tested the area surrounding the grain bin device to detect the presence or lack of presence of urine or any other foreign materials, including but not limited to DNA evidence.

38. Defendants never tested the equipment such as the grain sampler associated with the grain bin device to detect the presence or lack of presence of urine or any other foreign materials, including but not limited to DNA evidence.

39. Defendants never replaced or sanitized, nor ordered replaced the grain bin device, associated equipment or area.

40. Defendants never sought aid from other governmental bodies, such as the FBI which might have been more effective at detecting, including but not limited to DNA evidence.

41. Defendants were so negligent in their investigation that investigators dispatched from DC failed to learn that the area where the incident was alleged to have occurred had been substantially and materially altered, by removal of entire walls and doors, between the time of the alleged incident and their inspection of the site until being informed of that fact by Plaintiff.

42. Eventually it was apparently realized that the allegation that Plaintiff urinated directly in the grain bin device was literally impossible.

43. As such a purported witness, named Mary Vial was produced who then suddenly conveniently and utterly changed the story that rather than urinating in the grain bin device, Plaintiff told her she urinated in a bag in a sample bucket associated with the grain bin device, specifically because Plaintiff refused to use the porta potty on the rig she typically worked on.

44. There was no porta potty on the rig Plaintiff typically worked on.

45. Since Plaintiff could not have refused to use a porta potty that did not exist, the Vial "witness" clearly and irrefutably lied.

46. At all times pertinent to this matter that the Plaintiff worked at the rig as an inspector, normal restroom facilities were provided.

47. At all times pertinent to this matter that the Plaintiff worked at the rig as an inspector, the area where plaintiff worked was enclosed by walls and accessed through a door, although according to photos shown to Plaintiff by the DC investigator, the walls and doors were later removed.

48. At all times pertinent to this matter that the Plaintiff, plaintiff had no means to lock the door to her work area.

49. At the times Plaintiff was allegedly urinating in some manner in her work area anyone could have walked in at anytime.

50. Despite there being absolutely no evidence that Plaintiff herself ever urinated in any grain, any grain bin device, Defendants proceeded against Plaintiff as if she were guilty until proven innocent.

51. Even after Plaintiff was cleared of wrongdoing, she was still treated as if guilty of wrongdoing, ultimately.

52. Defendants never obtained, established or developed any evidence that any equipment or grain was in fact ever contaminated by Plaintiff or anyone else.

53. Defendants have consistently designated and referred to and treated Plaintiff as an intermittent employee.

54. Defendants have illegally consistently designated and referred to and treated Plaintiff as an intermittent employee.

    55. Pursuant to 5 CFR § 340.403 - Intermittent employment.

    **a)** *Appropriate use.* An intermittent work schedule is appropriate <u>only</u> when the nature of the work is sporadic <u>and</u> unpredictable so that a tour of duty cannot be regularly scheduled in advance. When an <u>agency</u> is able to schedule work in advance on a regular basis, <u>it has an obligation</u> to document the change in work schedule from intermittent to part-time or full-time to ensure proper <u>service</u> credit.

**Definition: Service from 5 CFR § 841.402 | LII /
Legal Information Insti...**

56. As stated by Office Field Manager Kenneth DeWert, in his sworn deposition in an unrelated matter, the work of the Agency is carried on "24/7, 7 days a week".

57. Plaintiff's duties were intimately connected to the inspection of ships and the loading of grain on ships.

58. Arrival, loading and departure time of ships is easily and effortlessly predictable is never sporadic in the 21st century.

59. For example, through publically available free information, 16 days ago the vessel AFRICAN RAPTOR, which was involved in another matter involving FGIS personnel,

was at Indonesia, coordinates 5.80311 S / 106.0728 E). The vessel was enrooted to the port of Gresik, sailing at a speed of 13.0 knots and expected to arrive there on Feb 28, 19:00.

60. In the 21st century ship arrival, loading and departure times are readily predictable and non-sporadic.

61. As such, give that Plaintiff's duties were intimately tied to ship arrival, loading and departure times are predictable and non-sporadic, her employment was arrival, loading and departure times are readily predictable and non-sporadic.

62. Since Plaintiff's employment was predictable and non-sporadic, Defendant were obligated by law to either designate Plaintiff as part-time or full-time

63. A reasonable person give modern resources and available facts can and could have predicted when Plaintiff could and should be scheduled.

64. Since Plaintiff's work was predictable it was illegal to designate and treat here as an intermittent.

65. Based on the foregoing, Plaintiff reasonably believes that in addition to herself, defendants continue to illegally designate employees as intermittent.

66. A reasonable person would have realized there was no time <u>reasonable</u> suspicion based on articulable fact that Plaintiff urinated or otherwise contaminated grain.

67. A reasonable person would have quickly deduced that the initial allegation against Plaintiff that Plaintiff urinated in the grain bin was false simply because it was physically impossible.

68. A reasonable person, if they truly and reasonably believed the initial allegation that Plaintiff urinated in the grain bin, would at least have secured the equipment originally alleged to have contaminated.

69. A reasonable person, if they truly and reasonably believed the initial allegation that Plaintiff urinated in the grain bin, would at least have ordered the equipment originally alleged to have contaminated at least sanitized.

70. Current Federal Law allows certain quantities of materials such as rodent droppings (feces), hairs and insect parts in grains and commodities.

71. The amount of materials such as rodent droppings, hairs and insect parts in grains and commodities allowed in a cargo capacity of a typical cargo ship, for example, a vessel like AFRICAN RAPTOR, under current Federal law far exceeds the amount of urine a human female can produce in an entire day.

72. Even if the false allegations of urination were true, Defendants alleged that a cargo shipment, potentially containing vastly greater quantities of rodent droppings(feces), hairs and insect parts than the Plaintiff could possible produce might be rejected as contaminated, while a shipment containing ONLY rodent droppings(feces), hairs and insect parts would be uncontaminated and perfectly acceptable.

73. Prior to being suspended and eventually terminated, Plaintiff routinely worked 40 hours a week or more.

74. Plaintiff reasonably believes that others similar situated to herself in the employment of the Defendants are routinely being illegally designated as intermittent employees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Prior to the action before the court, the Plaintiff timely filed charges with the United States Equal Employment Opportunity Commission.

2. Upon expiration of necessary delays and exhaustion of administrative remedies, Plaintiff timely filed this action and has complied with all administrative prerequisites to bring this lawsuit before this court.

## FIRST CLAIM FOR RELIEF

1. Plaintiff claims relief from multiple violations by listed Defendants of Plaintiff's rights under both the Constitution of the United States of America, the Constitution of the State of Louisiana, as well as applicable Federal and State Law.

## SECOND CLAIM FOR RELIEF

2. Plaintiff specifically claims relief from being illegally designated and treated as an intermittent employee.

## THIRD CLAIM FOR RELIEF

3. Plaintiff claims damages suffered due to actions and omissions of Defendants rights under both the Constitution of the United States of America, the Constitution of the State of Louisiana, as well as applicable Federal and State Law.

## DECLARATORY RELIEF ALLEGATIONS

1. A present and actual controversy exists between Plaintiff and Defendants concerning their rights and respective duties. Plaintiff contends that Defendants violated her rights under both the

Constitution of the United States of America, the Constitution of the State of Louisiana, as well as applicable Federal and State Law and committed violations thereof.

2. Furthermore that Defendants have and continue to violate the rights of similarly situated persons.

3. Plaintiff believes and thereon alleges that the Defendants deny these allegations.

4. Declaratory relief is therefore necessary and appropriate.

5. Plaintiff seeks a judicial declaration of the respective rights and duties of the parties.

## **PRAYER FOR RELIEF**

**WHEREFORE, PLAINTIFF PRAYS FOR RELIEF** as follows:

1. For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2. For lost wages, penalties and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3. For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

4. For punitive damages in an amount to be determined at trial;

5. For liquidated damages;

6. For interest on lost wages, compensation, and damages, including pre- and postjudgment interest and an upward adjustment for inflation;

7. For medical expenses and damages.

8. Such other damages and relief as this court shall find reasonable and proper.

Respectfully Presented On this 15th Day Of March, 2021.

*Albertha D. Badon* (signature)

Albertha D. Badon, *Pro Se*
426 South 17th Street
Baton Rouge, LA 70802
Telephone: (225) 907-6939
Email: badsoulties@gmail.com